THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
8                            AT SEATTLE

9    SUNWOOD CONDOMINIUM                    CASE NO. C16-1012-JCC
     ASSOCIATION,
10                                          ORDER ON MOTIONS FOR
11                        Plaintiff,        SUMMARY JUDGMENT
                 v.
12
     TRAVELERS CASUALTY INSURANCE
13   COMPANY OF AMERICA, *et al.*,

14                        Defendants.

15

16        This matter comes before the Court on multiple motions: Plaintiff Sunwood

17   Condominium Association's (the "Association") motion for partial summary judgment against

18   Defendant National Surety Corporation ("NSC") (Dkt. No. 79); the Association's motion for

19   partial summary judgment against Defendant St. Paul Fire & Marine Insurance Company ("St.

20   Paul") (Dkt. No. 82); Defendant St. Paul's motion for summary judgment (Dkt. No. 84); and

21   Defendant NSC's motion for summary judgment (Dkt. No. 88). Having thoroughly considered

22   the parties' briefing and the relevant record, the Court finds oral argument unnecessary and

23   hereby GRANTS in part the Association's motions and DENIES Defendants' motions for the

24   reasons explained herein.

25   I.    BACKGROUND

26        The Association maintains the two buildings at issue in this suit. (Dkt. No. 1 at 2.) The

exterior walls of these buildings are made of stucco applied over building paper/weather resistant barrier ("WRB") placed over plywood sheathing. (Dkt. No. 82 at 5.) In November 2014, The Association performed an intrusive investigation that uncovered "water intrusion and hidden damage" to the sheathing, framing, and WRB on exterior walls and decks of the buildings. (Dkt. Nos. 1 at 5, 80-1 at 3, 82 at 1.) On December 12, 2014, the Association submitted an insurance claim to all nine insurers that covered the buildings since their construction around 1980. (*Id*. at 2–4, 6). The Association and its insurers subsequently performed a joint follow-up investigation. (Dkt. No. 79 at 6.) The resulting report from the Association's expert detailed hidden water damage to sheathing and framing on both buildings. (Dkt. No. 1 at 6) The report found the damage had occurred "incrementally and progressively [during storm events] each year from 1979," when wind driven rain penetrated the buildings' exterior cladding. (Dkt. No. 80-1 at 53.) Insurer experts described water intrusion and wood decay "primarily due to . . . an inherent lack of drainage" and inadequate or defective construction. (Dkt. Nos. 79 at 6, 80-1 at 27–28, 82 at 7.) The Association's expert estimated necessary repairs would require removal of all stucco from both buildings at a cost of $2,789,155. (Dkt. No. 82 at 7.)

NSC and St. Paul subsequently denied coverage for the Association's claims. (Dkt. Nos. 80 at 2, 82 at 8.) The Association brought suit on June 29, 2016 against NSC, St. Paul, and other insurers. [1] (Dkt. No. 1 at 6–12.) The Association has settled its claims with all insurers named in its complaint except NSC and St. Paul. (*Id*. at 3–4). The Association brings a breach of contract claim against both NSC and St. Paul, and claims for violation of Washington claims handling standards, Consumer Protection Act, Insurance Fair Conduct Act, and for bad faith against NSC. (*Id*.) The Association seeks declaratory relief that insurance policies at issue covered its claim for hidden water damage, as well as monetary costs and damages. (*Id*.)

---

[1] Even though defendants issued Plaintiff more than one policy, the Court will refer to each of the defendant's policies collectively in the singular.

## II. POLICIES AND POSITIONS

### A. NSC

NSC insured the Sunwood complex from August 2001 to August 2008. (Dkt. No. 1 at 6–12.) The "all-risk" policy covered "all risks of direct physical loss or damage, except as excluded or limited" therein. (Dkt. No. 80-1 at 7.) Policy exclusions included loss or damage "caused by or resulting from . . . wear and tear, gradual deterioration, inherent vice, latent defect . . . mold, [or] wet or dry rot." (Dkt. No. 80-1 at 9.) A separate policy section excluded loss or damage caused by "inadequate or defective . . . construction." (*Id.* at 10.) Under both exclusion sections, the policy added: "but, if loss or damage from a **covered cause of loss** results, [NSC] will pay for that resulting loss or damage." (*Id.*) (emphasis in the original).

The Association describes its claim as for a single, progressive loss of "hidden water damage" to building framing and sheathing, caused by a combination of wind-driven rain, weather conditions, repeated seepage of water, and inadequate construction or maintenance. (*See* Dkt. Nos. 98 at 3, 80-1 at 53.) NSC argues the Association's claim is for multiple discrete losses of "dry rot damage" to building framing and sheathing, caused by inadequate construction that resulted in water intrusion and gradual deterioration. (Dkt. Nos. 88 at 2, 80-1 at 55.)

### B. St. Paul

St. Paul insured the complex from June 1997 to June 2001. (Dkt. No. 84 at 2.) The policy also covered all non-excluded risks. It excludes "wear and tear; deterioration, mold, wet or dry rot; . . . the inherent nature of the property." (*Id.* at 28.) A resulting loss clause applies to these exclusions: "if loss not otherwise excluded results, we will pay for that resulting loss." (*Id.*)

The Association asserts the same theory of loss, causation, and liability against St. Paul. St. Paul argues the Association's loss was caused primarily by faulty construction or latent defects in the building, combined with inadequate maintenance, deterioration, and wear and tear that allowed rain water to intrude behind exterior stucco. (Dkt. No. 82 at 2.) It characterizes the loss as comprised of "numerous separate events and conditions." (Dkt. No. 85 at 29.)

## III. LEGAL STANDARDS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B. Interpretation of Insurance Policies

Courts use a two-step process to determine whether insurance coverage exists: an insured must first show that the policy covers the loss; then to avoid coverage, an insurer must point to specific policy language excluding the loss. *Wright v. Safeco Ins. Co. of America*, 109 P.3d 1, 5 (Wash. Ct. App. 2004). "Interpretation of the terms of an insurance policy is a matter of law." *Allstate Ins. Co. v. Raynor*, 21 P.3d 707, 711 (Wash. 2001). The Court interprets undefined terms in policy language as they would be read by an ordinary insurance consumer. *See Moeller v. Farmers Ins. Co. of Wash.*, 267 P.3d 998, 1002 (Wash. 2011). Inclusionary clauses must "be liberally construed to provide coverage." *Riley v. Viking Ins. Co. of Wisconsin*, 733 P.2d 556, 558 (Wash. Ct. App. 1987). "Exclusionary clauses should be construed against the insurer with special strictness." *McAllister v. Agora Syndicate, Inc.*, 11 P.3d 859, 860 (Wash. Ct. App. 2000).

## IV. THE ASSOCIATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFEDNANT NSC

The Association seeks a determination that NSC's policies cover the cost of repairing

alleged water damage. It also seeks summary judgment on NSC's affirmative defenses based on: (1) NSC's suit limitation clause and (2) failure to mitigate. The Court DENIES the Association's motion for summary judgment on its breach of contract claim and coverage related issues. The Court GRANTS the Association's motion on NSC's affirmative defenses.

### A. Policy Coverage

The Association argues that NSC's policy covers its loss as a matter of law. The Court disagrees, finding genuine disputes of fact regarding coverage. Without making a coverage determination, the Court resolves several discrete legal issues related to the policy.

#### 1. Fortuitous Loss

The Association argues its loss was fortuitous. NSC denied coverage by asserting the loss was not fortuitous because it consisted of "long term damage" from "gradual and accumulated effects" of "recurring weather conditions . . . usual to the area (i.e. rain)." (Dkt. No. 80-1 at 54.) "The proper inquiry is not whether the rain is unexpected, but whether the loss is unexpected." *Babai v. Allstate Ins. Co.,*, No. C12-1518-JCC, slip op. at 6–7 (W.D. Wash. Oct. 8, 2014). NSC's policy contains no exclusion for rain, and NSC cannot create one with a fortuitousness argument. *See Babai*, No. C12-1518-JCC, slip op. at 4 (W.D. Wash. Dec. 13, 2013). If a jury finds hidden, unexpected damage at Sunwood was caused by exposure to rain, the loss was fortuitous.

#### 2. Weather, Wind-Driven Rain, and Repeated Seepage of Water

The Association argues weather, wind-driven rain, and repeated seepage of water are covered perils under NSC's policy because they are not specifically excluded. (Dkt. No. 79 at 11) (citing *Sunbreaker Condominium Assn v. Travelers Ins. Co.*, 901 P.2d 1079, 1083 (Wash. Ct. App. 1995). The Court agrees. NSC's policy excludes loss or damage caused by "weather conditions" only when combined with earth movement, flood, or other excluded perils not relevant here. (Dkt. No. 80-1 at 10.) It does not mention rain or repeated seepage of water. NSC does not contest that these perils are distinct from inadequate construction, rot, and deterioration. To the extent NSC argues its exclusions for deterioration and rot apply despite the influence of

rain, the Court reads this as a causation argument for the jury, not an assertion that rain and water seepage are subsumed under these exclusions. (*See* Dkt. No. 91 at 7.)

### 3. Combination of Covered and Excluded Perils

The Association argues that when a covered cause of loss (rain water intrusion) combines with an excluded cause of loss (inadequate construction), the resulting loss is covered as a matter of law. (Dkt. No. 79 at 9.) NSC takes the position that rain is too remote to the loss to mandate such coverage. (Dkt. No. 91 at 5.) NSC asserts its exclusions for gradual deterioration and rot apply unless a jury finds that rain alone was the efficient proximate cause of the loss. (*Id*. at 7.) The Court agrees with NSC that coverage cannot be determined as a matter of law here, but agrees generally with the legal principle the Association asserts—NSC's policy covers an otherwise excluded loss if it is proximately caused by concurrent excluded and covered perils.

Washington's efficient proximate cause ("EPC") rule applies "where two or more distinct perils . . . cause a loss, and the policy covers one . . . but not all" perils. *Sunbreaker Condo Ass'n*, 901 P.2d at 1082–83. It imposes liability "for a loss efficiently caused by a covered peril, even though other, excluded perils contributed to the loss." *Id*. The rule does not operate in reverse, automatically mandating exclusion of a loss when an excluded peril is the EPC. *Vision One, LLC*, 276 P.3d at 30. Specific policy language is required for that result. *Id.* Unless precluded by policy language, the rule leads to coverage where a covered peril combines with an excluded peril as the concurrent EPC of the loss. *See id.* at 310.

NSC argues *Vision One*'s finding of coverage for concurrent causation is limited to policies that exclude listed perils that "solely and directly" cause a loss. (Dkt. No. 91 at 6.) Instead, NSC would have the Court read its "caused by" exclusion to preclude coverage unless the covered cause of loss is the sole EPC. (*See* Dkt. No. 91 at 7.) The Association responds that *Vision One*'s holding did not depend on the "solely and directly" language; rather it turned on the principles of the EPC rule and the fact that the policy did not exclude concurrent causes. *Id*. at 521–22). The Court adopts the Association's reading of *Vision One*. *Accord Greenlake*

*Condominium Association v. Allstate Insurance Co*., No. C14-1860-BJR, slip op. at 20–30 (W.D. Wash. Dec. 23, 2015).

The plain language of NSC's policy supports coverage of concurrent proximate causes. The policy contains an "inverse EPC" clause in an exclusion paragraph not relevant here. (Dkt. No. 80-1 at 8.) Section D.1 excludes loss or damage "regardless of any other cause or event that contributes concurrently or in any sequence of the loss." (*Id*.) A court must construe an insurance policy as a whole. *Transcontinental Ins. Co. v. Washington Public Utilities Sys.,* 760 P.2d 337, 339 (Wash. 1988). The application of a concurrent cause exclusion to other perils but not to the ones at issue here is indicates an intent to cover the damage or loss here if it results from concurrent covered and excluded causes. Whether excluded and covered perils were concurrent efficient proximate causes of the Association's loss is a question for the finder of fact.

### 4. Ensuing Loss Provision

The Association's argues that NSC's ensuing loss provision still provides coverage where an excluded peril is the sole EPC of a loss, and the resulting peril or loss is covered. (Dkt. No. 79 at 14, 15.) Ensuing loss clauses "ensure that if [a] specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered." *Vision One*, 276 P.3d at 307. NSC's ensuing loss provision states "if loss or damage from a covered cause of loss results, NSC will pay for the resulting damage." (Dkt. No. 80-1 at 9.) By these terms, if an excluded peril (e.g. inadequate construction) brings about a covered *peril* (e.g. rain intrusion, repeated water seepage, or water damage), any resulting damage is covered.

NSC attempts to avoid this result by arguing there is no covered ensuing loss here as a matter of law. (Dkt. No. 91 at 8–9.) NSC relies on *Sprague v. Safeco Ins. Of Am.*, to assert that "there is no damage beyond the defectively constructed exterior wall," an excluded loss itself. (Dkt. No. 91 at 8–9) (citing 276 P.3d 1270, 1272 (Wash. 2012) (denying coverage under an ensuing loss provision where damage did not extend beyond excluded rot and construction defects in a wall). But *Sprague*'s holding rested on an absence of facts showing the occurrence of

the Association's asserted covered loss—collapse. *Id*. Here, the Association presents facts to show its asserted covered losses—rain intrusion and water damage—occurred. NSC argues "water intrusion through walls" cannot be a separate resulting loss from construction defects. (Dkt. No. 91 at 9) (citing *Wright*, 109 P.3d at 5) The court in *Wright* held that water leaks were not covered as an ensuing loss of construction defects, where the policy excluded loss caused "directly or indirectly by construction defects." *Id*. NSC's policy contains no such limitation.

The resulting loss provisions in *Sprague* and *Wright* are distinct from this case. Both hinge on whether the *resulting loss* was covered. 276 P.3d at 1272 ("any ensuing loss not excluded is covered"); 109 P.3d at 5. In contrast, NSC's provision depends on whether the loss results from a *covered cause.* (Dkt. Nos. 95 at 6, 80-1 at 9) ("if loss or damage from a covered cause of loss results, we will pay for that resulting loss or damage"). NSC cannot avoid the plain language of its policy. To the extent that there is any ambiguity in this provision, it must be resolved in favor of the insured. *McAllister*, 11 P.3d at 860. Still, the Court cannot hold here that coverage exists under the ensuing loss clause because a reasonable juror could determine that the EPC and resulting cause of loss are both excluded perils.

### 5. NSC's Commencing Condition

The Association asks the Court to construe NSC's "commencing" condition in its favor and find the provision met as a matter of law. (Dkt. No. 79 at 17.) NSC's policy limits coverage to "loss or damage commencing during the policy period." (Dkt. No. 80-1 at 14.) The Association argues that "commencing" is ambiguous. (Dkt. No. 79 at 17). It urges the Court to construe the term as "each instance of new damage or loss in a series of multiple events of loss or damage." (*Id.*) NSC asserts the term is unambiguous: if the Association's claim is for a single, progressive loss, with damage beginning at construction, the loss or damage did not commence during its policy period. (Dkt. No. 91 at 10–12.) The Association interprets this position to read "commencing" as the first occurrence of the type of damage or loss claimed. (Dkt. No 88 at 7.)

Because the term is undefined in the policy and "susceptible of two different but reasonable interpretations," it is ambiguous and must be construed against the insurer. *McAllister*, 11 P.3d at 860. The Association rightly observes that NSC could have defined "commencing" in its policy if it intended to limit the term as it does here. (Dkt. No. 79 at 20) (citing *Association of Unit Owners of Nesting v. State Farm Fire and Casualty Co.,* 670 F. Supp. 2d 1156, 1159-60 (D. Or. 2009)). But NSC is correct that the Association's proposed definition relies on cases that find loss "commenced" upon each "identifiable instance of new damage or loss." *See Association of Unit Owners of Nesting*, 670 F. Supp. 2d at 1160; *Eagle Harbour Condo. Ass'n v. Allstate Ins. Co.*, No. C15-5312-RBL, slip op. at 6 (W.D. Wash. Apr. 10, 2017) (citing *Temperature Serv. Co. v. Acuity*, No. C16-2272, slip op. at 6 (N.D. Ill. Oct. 14, 2016). The Association must identify instances of new damage during NSC's policy period to trigger coverage.

The Association cites expert opinions that new damage occurred with each significant wind driven rain event since 1979. (Dkt. Nos. 80-1 at 77–78, 81-1 at 4–5.) NSC argues that damage began shortly after construction and merely "progressed" during the policy period. (Dkt. No. 91 at 12.) Whether the Association can show damage or loss commencing during NSC's policy period is a question for the jury.

### 6. Joint and Several Liability

The Association argues that NSC is jointly and severally liable for its loss based on the continuous trigger rule. (Dkt. No. 79 at 20.)

Under Washington liability insurance law, "progressive or incremental damage, *i.e.* damage that occurs in a "process,' is treated as a single, continuing 'occurrence'" for liability purposes. *Greenlake Condominium Association v. Allstate Insurance Co*., No. C14-1860-BJR, slip op. at 20–30 (W.D. Wash. Dec. 23, 2015) (citing *Gruol Const. Co. v. Ins. Co. of N. Am*., 524 P.2d 427, 430 (Wash. App. 1947)). Once coverage is triggered in one or more policy periods, those policies provide full coverage for all incremental and continuing damage, without

allocation between insurer and insured. *See Travelers Prop. Cas. Co. of America v. AF Evans Co.*, No. C10-1110-JCC, slip op. at 3 (W.D. Wash. Dec. 11, 2012). This "continuous trigger rule" means that "when damage is continuing, all triggered policies provide full coverage." *American Nat'l Fire v. B&L Trucking*, 951 P.2d 250, 255 (Wash. 1998).

The Association argues the "continuous trigger rule" applies here: it need only establish that "some damage commenced during the coverage period," for NSC to be held jointly and severally liable for its loss. (Dkt. No. 79 at 4.) NSC disputes that the rule applies in a non-liability insurance context or to a policy with a "commencing" condition, such as theirs. (Dkt. No. 91 at 13–14.) Application of the rule to first party property insurance contracts has not been finally settled by Washington courts. (*Id.* at 12.) But this Court agrees with others in this district that have found no authority distinguishing between first-party property insurance and third-party liability insurance coverage with respect to this principle and that have applied the continuous trigger rule to policies with a commencing condition. *See Greenlake Condominium Association*, No. C14-1860 at 12 (W.D. Wash. Dec. 23, 2015); *Eagle Harbour Condo. Ass'n*, No. C15-5312-RBL at 7 (W.D. Wash. Apr. 10, 2017); *Parkridge Associates LTD v. West American Insurance Company*, C01-0372-TSZ, slip op. at 7 (W.D. Wash. Jun. 7, 2002). This conclusion is further supported by the absence of a temporal limitation of coverage in NSC's policy. If the insurer intends to be liable solely on a *pro rata* basis, the insurer must include that language in its policy. *Gruol Const. Co.*, 524 P.2d at 426–27; *see also Greenhouse Condo. Homeowners Assoc. v. Chubb Customs Ins. Co.*, No, C03-2941-RSM, slip op. at 9 (W.D. Wash. Jul. 8, 2004).

The Court finds the continuous trigger rule may be applied here, but a jury must determine whether the Association's loss was progressive and incremental, with new loss commencing and damage worsening during NSC's policy period.

### B. NSC's Affirmative Defenses

#### 1. Suit Limitation Clause

The Association asks the Court to dismiss NSC's suit limitation clause defense. (Dkt. No. 79 at 22.) NSC's suit limitation clause requires a policy holder to bring any legal action "within 2 years after the date on which the direct physical loss or damage occurred." (Dkt. No. 80-1 at 20.)

NSC argues that The Association's suit is not timely because it was filed more than two years after NSC's coverage ended. (*See* Dkt. No. 88 at 10.) A suit limitation clause that hinges on when a loss "occurs" begins to run when hidden damage is "concluded or exposed," not upon termination of an insurance policy. *Panorama Vill. Condo. Owners Ass'n Bd. Of Directors v. Allstate Ins. Co.*, 26 P.3d 910, 915 (Wash. 2001). NSC argues *Panorama Village* applies only to policies that cover collapse caused by hidden decay. *Id.*; (Dkt. No. 88 at 11.) The Court disagrees. *See Holden Manor Homeowner's Association v. Safeco*. No. C15-1676-JCC, slip op. at 6 (W.D. Wash. Jun. 16, 2016); *Greenlake Condominium Association v. Allstate Insurance Co.*, No. C14-1860-BJR, slip op. at 3–4 (W.D. Wash. Dec. 23, 2015). NSC does not dispute that the damage to the buildings at issue here was exposed in December 2014 and was sued on in June 2016. Because suit was brought within the two-year period, the Court GRANTS the Association's motion for summary judgment on this issue.

#### 2. Failure to Mitigate Defense

NSC presents no facts to support a failure to mitigate defense. (*See* Dkt. No. 95 at 2; Dkt. No. 91.) The Court GRANTS the Association's motion for summary judgment on this defense.

## V. NSC'S MOTION FOR SUMMARY JUDGMENT

NSC moves for summary judgment on the Association's breach of contract/coverage claims and extra-contractual claims. The Court DENIES the motion as explained below.

### A. Policy Coverage Claims

NSC argues "there is no set of facts" that can satisfy the policy's commencement, deductible, and suit limitation clauses. (Dkt. No. 88 at 1, 10) ("The Association's claim is either

one large loss that commenced in 1979 or an indefinite number of trivial occurrences of losses, no one of which can be shown to exceed the deductible."). Under the Court's interpretation of NSC's commencement clause, deductible clause, and relevant law on suit limitation clauses, the Court disagrees and DENIES summary judgment on the issue of policy coverage.

### 1. Commencing Condition

NSC argues the Association's claims should be dismissed because its loss cannot meet its policy's commencing condition. NSC's policy limits coverage to "loss or damage commencing during the policy period." (Dkt. No. 80-1 at 14.) The Court has found that to satisfy this condition, the Association must show identifiable new damage during NSC's policy period, contributing to an ongoing, progressive loss. *See supra*, section IV.A.5.

NSC further argues that even if identifiable loss or damage commenced during its policy period, no single rain event ("occurrence") caused a loss exceeding the policy deductible of $5,000. (Dkt. No. 88 at 1, 4.) NSC's policy does not "pay for loss or damage in any one occurrence until the amount of loss or damage exceeds [$5000]." (Dkt. No. 80-1 at 14.)

The Association argues it meets NSC's deductible requirement because cumulative damage from different rain events should be treated as one "occurrence." (Dkt. No. 98 at 5.) NSC finds this position inconsistent with the Association's "commencing" argument. (Dkt. No. 88 at 10) (arguing the Association's loss cannot be one "occurrence" for purposes of the deductible and numerous trivial "occurrences" triggering coverage). But "loss" and "damage" are distinct terms, and damage could commence during the policy period, resulting in a cumulative loss. *See Lui v. Essex Ins. Co.*, 375 P.3d 596, 602 (Wash. 2016). In so finding, the Court does not rule that the Association's loss must be treated as one "occurrence" as a matter of law. (Dkt. No. 98 at 5.) The Association's argument to this end is based on case law involving joint and several liability. *See Greenlake Condominium Association v. Allstate Insurance Co*., No. C14-1860-BJR, slip op. at 16 (W.D. Wash. Dec. 23, 2015)*; Travelers Prop. Cas. Co. of Am. V. AF Evans Co,* No. C10-1110-JCC, slip op. at 2 (W.D. Wash. Dec. 11, 2012). The Court

declines to extend its liability analysis to provide a definition for the undefined term "occurrence" in NSC's deductible provision.

If insurance policy terms are not defined they are given their "plain, ordinary" meaning. *Kitsap County v. Allstate Ins. Co*. 964 P.2d 1173, 1177 (Wash. 1998). Ambiguities are given the meaning most favorable to the insured. *Id*. By its plain meaning, "occurrence" can signify "happening" or "appearance." Webster's Third New International Dictionary (Unabridged ed. 2017). But even adopting the definition of "occurrence" NSC urges—"event or incident"—a jury could still find that The Association suffered progressive damage cumulating in one "event" of "loss." Given its plain meaning most favorable to the insured, "loss" means "the amount of a claim on an insurer by the insured." (Dkt. No. 98 at 15.) (citing to American Heritage Dictionary online). In this scenario, the Association would need only show that the resulting loss exceeds $5,000. Furthermore, the Association presents facts supporting a finding that they can meet the deductible amount even under NSC's proposed construction. (*See* Dkt. No. 99-1 at 2.) NSC fails to show that the Association cannot meet its deductible as a matter of law.

The Court DENIES NSC's motion for summary judgment based on NSC's commencing and deductible provisions.

### 2. Suit Limitation Clause Affirmative Defense

For the reasons stated in section IV.B.1., the Court DENIES NSC's motion for summary judgment based on its suit limitation provision.

### B. Extra-Contractual Claims

NSC moves for summary judgment on the Association's bad faith, Insurance Fair Conduct Act, and Consumer Protection Act claims if the coverage claims are dismissed. (Dkt. Nos. 88 at 1, 112 at 10.) The Court DENIES summary judgment on these claims because it did not resolve the coverage issue.

## VI. THE ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT AGAINST ST. PAUL

The Association seeks a determination that St. Paul's policies cover the cost of repairing alleged water damage. It also seeks summary judgment on St. Paul's affirmative defenses: (1) fortuitous loss (2) known loss/loss-in-progress; (3) failure to give timely notice; (4) suit limitation clause; and (5) waiver, estoppel and laches. The Court DENIES the Association's motion for summary judgment on the question of coverage. The Court GRANTS the Association's motion on NSC's known loss/loss-in-progress and waiver, estoppel, and laches defenses and DENIES the motion as to remaining defenses.

### A. Policy Coverage

The Association argues that St. Paul's policy covers its loss as a matter of law. The Court disagrees, finding genuine disputes of fact regarding coverage. Without making a coverage determination, the Court resolves several discrete legal issues related to the policy.

#### 1. Water, weather conditions, and repeated seepage of water

The Association argues that St. Paul's policy covers damage from the perils of water, weather conditions, and repeated seepage of water because it does not exclude them. *See Vision One, LLC*, 276 P.3d at 513. The Court agrees. The policy excludes water only as it relates to flood, surface water, waves, mudslide, sewer back-up and other similar conditions. (Dkt. No. 84 at 28.) Similarly, weather condition are excluded only to the extent that they combine with earth movement, water (as limited above), and other unrelated causes. (*Id.* at 29). St. Paul argues that "wind-driven rain" is not a separate peril from the excluded peril of "deterioration." (Dkt. No. 103 at 10.) It asserts that finding separate coverage for a "process" that causes gradual, long-term deterioration would read the exceptions out of the policy. (Dkt. No. 103 at 12.)

The Court distinguishes among perils as a matter of law. *Wright*, 109 P.3d at 5. St. Paul's reasoning ignores the principle of an all-risk policy by allowing an insurer to exclude anything that could cause gradual damage without writing that exclusion into the policy. In a similar case, this Court determined that the ordinary meaning of "deterioration" was "the action or process of

deteriorating or state of having deteriorated: gradual impairment." *Windsong Condominium Ass'n v. Bankers Standard Ins. Co. et al.*, No. C08-0162-JCC, slip op. at 27 (W.D. Wash. Dec. 12, 2008) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 616 (2002)). "Deteriorate" means "to make inferior in quality or value: impair." *Id*. The Court concluded that deterioration can occur without the presence of water damage. *Id*. Thus, in *Windsong* it was reasonable to read a "deterioration" exclusion as precluding coverage for deterioration, but not for rain intrusion. *Id*. The same principle applies here. The Court concludes that rain and water seepage are not subsumed by the policy's "deterioration" exclusion.

The Court also rejects St. Paul's assertion that its "inherent nature" exception includes rain or water seepage. (Dkt. No. 103 at 12.) Paul's policy defines "inherent nature" as "latent defect or any quality in the property that causes it to deteriorate or destroy itself." (Dkt. No. 104-1 at 31.) St. Paul draws an analogy to a Texas case where an "inherent nature" policy exclusion precluded coverage of water intrusion that caused porous bricks to freeze and crumble. *State Farm Fire & Casualty Co. v. Volding,* 426 S.W. 2d 907 (Tex. App. 1968). But neither party here argues the stucco caused the Association's loss. Rather inadequate construction—whether up to code at the time or not—allowed water entry. Latent defects and construction defects are not synonymous. *Babai*, No. C12-1518-JCC at 10-11 (W.D. Wash. Dec. 13, 2013). Wind-driven rain and water seepage are distinct, covered perils under NSC's policy.

2. <u>Combination of Covered and Excluded Perils</u>

Unless otherwise stated by policy language, a covered cause of loss and excluded cause of loss can combine as the EPC of a loss, leading to coverage. *See supra* section IV.A.3. St. Paul claims policies "in force from June 1999 through June 2001 contain [concurrent-peril exclusion language]." (Dkt. No. 103 at 17.) This misrepresents policy language. The relevant section changes a prior "concurrent peril exclusion" to a "direct and sole cause" or "cause initiating a sequence" exclusion.[2] (*Id*.) In none of the Association's policies with St. Paul does either version

_____

[2] Stating in relevant part: "your insuring agreement may include exclusions which include

of the language apply to exclusions relevant here. Similarly, while the policy does not cover loss "caused or *made worse by*" wear and tear, deterioration, mold, rot, or the inherent nature of the property, St. Paul's inadequate design or construction exclusion contains no such limiting language. Thus, the Association's loss would be covered if caused by concurrent perils of rain and inadequate construction. St. Paul and the Association disagree as to the EPC of the loss. Both provide expert testimony to support their positions. This creates an issue of fact for the jury.

### 3. Ensuing Loss Provision

The Association argues in the alternative for coverage under St. Paul's ensuing loss provisions. (Dkt. No. 82 at 18.) The provision for inadequate construction states: "if a loss not otherwise excluded results, we'll pay for that resulting loss. (*See* Dkt. No. 104-3 at 42.) The resulting loss clause for wear and tear, deterioration, and rot was the same in 1999, but in other years stated: "if a loss that would otherwise be covered results from one of these causes, we'll pay for the direct loss that results." (Dkt. Nos. 104-1 at 32, 104-2 at 33, 104-3 at 44, 104-4 at 44.) Interpretation of contractual language is a matter of law for the Court. *Overton v. Consolidated Ins. Co.*, 38. P.3d 322, 325 (Wash. 2002). Each of these clauses provides coverage for a covered ensuing loss even if the EPC is excluded. Whether a covered loss ensued from excluded perils is an issue of fact for the jury.

### 4. Joint and Several Liability

The Association argues that St. Paul should be held jointly and severally liable for its loss as a matter of law, based on the continuous trigger rule. St. Paul argues its policy was never triggered because (1) no hidden damage existed exceeding its deductible during its policy period or (2) no one "wind-driven rain event" caused damage exceeding its deductible. (Dkt. No. 103 at

---

the following statement. Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. . . . This statement is replaced by the following. We won't pay for loss or damage caused by any of the excluded events described below . . . if the event directly and solely results in the loss or damage; or if the event initiates a sequence of events that result in the loss or damage." (Dkt. No. 103 at 17.)

21.) The Court has not precluded use of that continuous trigger rule here. *Supra* section IV.A.6. But the underlying issues of whether the Association's loss was progressive and whether damage occurred during St. Paul's policy period remain questions of fact. *See id.* [3]

**B.    St. Paul's Affirmative Defenses**

**1.    Fortuitous Loss**

To the extent that the Association seeks a ruling on whether a fortuitous loss can be caused by wind driven rain even where rain is a certainty, the Court reiterates that loss from rain is fortuitous where the resulting loss is not expected and the policy does not exclude damage caused by rain. *See supra* section IV.A.1. Here, there is no policy exclusion for rain. But St. Paul disputes the loss was unexpected, presenting facts that could allow a reasonable juror to conclude the Association knew about damage in the repair scope before its coverage took effect and the Association could have avoided the loss. (Dkt. No. 103 at 7–10.)

**2.    Known Loss/Loss-in-Progress Defense**

The Association moves for summary judgment on St. Paul's known loss defense. Under the "known loss" or "loss-in-progress" doctrine, an insurer must show the insured subjectively knew of a "substantial probability" the loss would occur at the time insurance was purchased. *Hillhaven Props. Ltd. v. Sellen Constr. Co.*, 948 P.2d 796, 799 (Wash. 1997). The insured's expectation of risk is a question of fact. *Id.*

To prevail on this defense, St. Paul must show when the Association purchased insurance with St. Paul, it knew of a substantial probability that damage asserted in its present claim would occur. As evidence of the Association's subjective knowledge, St. Paul offers photographs from a 1994 and 1996 repair of rotting decks at Sunwood. (Dkt. No. 103 at 8.) From this evidence St. Paul concludes the Association knew "deck railing walls and building wall corners were

---

[3] St. Paul's policy does not contain the same commencing condition at issue in NSC's policy, thus damage need only occur during the policy period to trigger liability. (*See e.g.* Dkt. No. 104-1.)

susceptible to leakage and rot." (*Id.*) This limited showing is not sufficient to establish the Association knew of a substantial probability that systemic water damage was occurring beyond the deck repairs. *See Celotex Corp.*, 477 U.S. at 324. The Association's motion for summary judgment on St. Paul's known loss defense is GRANTED.

### 3. Late Notice Defense

The Association moves for summary judgment on St. Paul's late notice defense. St. Paul's policy requires notice "as soon as possible" whenever "there is a property loss that may be covered." (*See* Dkt. No. 104-1 at 13.) St. Paul does not claim that notice was required during its coverage period. (*See* Dkt. No. 103 at 23–24.) Instead it argues that the Association knew about damage in the repair scope before the 2014 intrusive investigation and failed to give notice. (*Id.*) (citing its expert's opinion to this end). St. Paul presents facts from which a reasonable juror could agree with this assertion. The Association's motion for summary judgment on St. Paul's late notice defense is DENIED.

### 4. Suit Limitation Clause

The Association moves for summary judgment on St. Paul's suit limitation defense. St. Paul's policy requires that "any lawsuit to recover on a property claim must begin within 2 years after the date on which the direct physical loss or damage occurred." (Dkt. No. 83-2 at 7.) The Association argues that an "after the loss occurred" suit limitation provision begins to run only when the loss was exposed or concluded. (Dkt. No. 82 at 21.) According to the Association, the provision was triggered by its 2014 intrusive investigation. (Dkt. No. 100 at 9.) St. Paul argues that each wind-driven rain event triggered the suit limitation period for the specific damage it caused. (Dkt. No. 84 at 2.) Under this theory, all loss under its policy "occurred" over two years before the filing date.[4] (*Id.*)

Like NSC, St. Paul first attempts to avoid *Panorama*'s interpretation of "occurred" by

---

[4] Parties entered into an agreement tolling the suit limitation clause on January 23, 2015, making this the effective filing date. (Dkt. No. 85 at 21.)

arguing the rule applies only to collapse cases that involve explicit coverage for "collapse caused by hidden decay." (Dkt. No. 84 at 13.) For the reasons stated in section VI.B.1., *supra*, the Court finds no such limitation.[5] But, St. Paul also disputes the characterization of all of the damage in the Association's proposed repair scope as "hidden" until 2014. It offers expert testimony to show some damage was "open and obvious" and other areas had been previously opened and incompletely repaired. (*See* Dkt. No. 86 at 2–3.) This evidence successfully raises a material issue of fact regarding whether all damage in the Association's claim was exposed only upon the 2014 intrusive investigation. On this basis, the Court DENIES the Association's motion for summary judgment on this defense.

### 5. Waiver, Estoppel, and Laches

St. Paul agrees that its waiver, estoppel, and laches defenses may be dismissed. (Dkt. No. 103 at 1). The Court hereby DISMISSES these defenses.

## VII. ST. PAUL'S MOTION FOR SUMMARY JUDGMENT

St. Paul moves for summary judgment on the basis that the Association's suit was not timely filed. In the alternative, St. Paul asks the Court to find that as a matter of law, it cannot be held liable for losses that occurred outside its policy period or after January 22, 2013. (Dkt. No. 84 at 18.) The Court DENIES St. Paul's motion on both theories.

### A. Suit Limitation Clause

St. Paul moves for summary judgment on the basis that the Association failed to comply with its suit limitation clause. In addition to the arguments discussed in section VI.B.4., St. Paul

---

[5] Defendants challenge this Court's holding to this end in *Holden Manor* by analogizing to a statute of limitations and medical malpractice case. *Steele v. Orangon* involved a patient who was aware of an injury due to medical malpractice, but did not pursue her tort claim until her damage had worsened from loss of sensation in limbs to heart attack. 716 P.2d 920, 922 (1986) (plaintiff was aware of some injury, thus the statute of limitations began to run even before she knew the full extent of the damage). The rationale in *Panorama* is based on continuing damage rather than a plaintiff's knowledge of injury. The Court finds no reason to abandon its prior holding.

asserts the Association's loss must be treated as multiple individual losses—with individual suit limitation periods triggered by each damage-causing rain event. (Dkt. No. 84 at 7–8.) The Association counters that under *Panorama*, a progressive loss "occurs" once—when exposed. (Dkt. No. 100.) The Court agrees that St. Paul's approach, applied to a progressive loss, would turn its "after the loss occurs" limitation clause into an "after inception" clause. (*See id.*) The court in *Panorama* distinguished the two types of suit limitation clauses, pointing out the latter "provides greater protection for an insurer where a progressive loss is concerned." *Panorama Vill. Condo. Owners Ass'n Bd. Of Directors*, 26 P.3d at 914. St. Paul cannot rewrite its clause through litigation.

*Panorama* applies and the Association's suit was timely if its loss was progressive and hidden until 2014. These remain questions of fact. St. Paul's motion for summary judgment is DENIED.

## B. Limitation of Liability

The Court has rejected St. Paul's argument that joint and several liability is not applicable absent a policy definition of "occurrence" as "continuous or repeated exposure to conditions." *See supra* section VI.A.5. If a jury finds the Association's loss was progressive and incremental, it will be treated as a single occurrence for liability purposes. *See id*. St. Paul further asserts that its policy language precludes liability for loss occurring after its policy period by stating: "coverage ends" on a date certain. (Dkt. No. 84 at 23.) This language does not change the Court's analysis. A policy end date is not the same as a temporal limitation on the scope of coverage specifying liability on a pro rata basis. *See Windsong Condominium Ass'n*, No. C08-0162-JCC at 17 (W.D. Wash. Dec. 12, 2008).

## VIII. CONCLUSION

For the foregoing reasons, the Court hereby finds and ORDERS that:

(1) The Association's motion for partial summary judgment against NSC (Dkt. No. 79) is

GRANTED in part as follows:

(a) summary judgment on coverage for the Association's claim is DENIED;

(b) summary judgment on NSC's suit limitation defense is GRANTED;

(c) summary judgment on NSC's failure to mitigate defense is GRANTED.

(2) NSC's motion for summary judgment against the Association (Dkt. No. 88) is DENIED.

(3) The Association's motion for summary judgment against St. Paul (Dkt. No. 82) is GRANTED in part as follows:

(a) summary judgment on coverage for the Association's claim is DENIED;

(b) summary judgment on St. Paul's fortuitous loss, late notice, and suit limitations clause defenses is DENIED;

(c) summary judgment on St. Paul's known loss/loss-in-progress, waiver, estoppel, and laches defenses is GRANTED;

(4) Defendant St. Paul's motion for summary judgment (Dkt. No. 84) is DENIED.

DATED this 16th day of November 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE